UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

UNITED STATES OF AMERICA,                                25-CR-40 (WFK)

      - against

DIMITRIY NEZHINSKIY,

                  Defendant.

-----------------------------------------------------------X

**SENTENCING MEMORANDUM ON BEHALF OF DIMITRIY NEZHINSKIY**

DAVID M. ESKEW
ABELL ESKEW LANDAU LLP
256 Fifth Avenue, 5th Floor
New York, NY 10001
Telephone: (646) 970-7342
Facsimile: (646) 970-7345
E-mail: deskew@aellaw.com

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

DISCUSSION .................................................................................................... 4

    I.    The Sentencing Guidelines ................................................................ 4

    II.    There are No Applicable Sentencing Departures at Step Two of the Analysis .......................................................................................... 5

    III.    Consideration of the § 3553(a) Factors Favors a Downward Variance ................. 5

        A.    Dimitriy's History and Characteristics Warrant a Downward Variance. ... 7

            *1. A Childhood Marked by Persecution, Profound Loss, and Displacement.* ................................................................ 7

            *2. Dimitriy's Dedication to His Hardworking, Immigrant Family.* .......... 10

            *3.The Impact on Dimitriy's Young Daughter.* ......................... 12

            *4. Dimitriy's Commitment to Using His Experience to Serve Others.* ...... 14

        B.    The Nature and Circumstances of the Offense Justify a Downward Variance. ............................................................. 16

        C.    A Lengthy Sentence Is Not Necessary for Deterrence, Societal Protection, or Rehabilitation. ................................................ 18

CONCLUSION .............................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Gall v. United States*
  552 U.S. 38 (2007) ............................................................................ 4, 5, 6, 7

*Kimbrough v. United States*
  552 U.S. 85 (2007) ..................................................................................... 5

*Pepper v. United States*
  562 U.S. 476 (2011) ................................................................................... 6

*United States v. Chavez,*
  710 F. Supp. 3d 227 (S.D.N.Y. 2024) ....................................................21

*United States v. Collucci,*
  743 F. Supp. 3d 452 (E.D.N.Y. 2024) .....................................................21

*United States v.Crosby,*
  397 F.3d 103 (2d Cir. 2005) ...................................................................... 4

*United States v. Fernandez,*
  443 F.3d 19 (2d Cir. 2006) ..................................................................... 4, 5

*United States v. Gonzalez,*
  No. 18-Cr-669 (S.D.N.Y. Apr. 2, 2021) ..................................................21

*United States v. Jones*
  460 F.3d 191 (2d Cir. 2006) ...................................................................... 6

*United States v. Kaziu,* 768 F. Supp. 3d 477,
  484-85 (E.D.N.Y. 2025) ...........................................................................20

*United States v. Manzella*
  475 F.3d 152 (3d Cir. 2007) .................................................................... 20

*United States v. Martinez-Rojas,*
  1:15-CR-00348, 2023 WL 4867433 (E.D.N.Y. July 31, 2023) ...............20

*United States v. Park,*
  758 F.3d 193 (2d Cir. 2014) .................................................................. 5, 6

*United States v. Parish,*
  No. 13-CR-829 (AY), 2024 WL 3904626 (S.D.N.Y. Aug. 22, 2024)........21

*United States v. Shy,*
  538 F.3d 933 (8th Cir. 2008) ..................................................................... 5

**Statutes**

18 U.S.C. § 3553(a) ................................................................. 3, 4, 5, 6, 7, 14, 16

18 U.S.C. § 3553(a)(1).......................................................................... 7, 16

18 U.S.C. § 3553(a)(2).......................................................................... 18, 20

18 U.S.C. § 3582(a) .................................................................................. 20

## <u>INTRODUCTION</u>

Dimitriy Nezhinskiy's life has been marked by tragedy and trauma from a young age. He was born and raised under communist control in what was known at the time as the Georgia Soviet Socialist Republic. Despite his parents' hard work and admirable careers—his father a doctor and mother a teacher—the family struggled financially and often lacked basic comforts like heat, electricity, or hot water. Being Jewish, the family also regularly faced antisemitism and persecution. One notable incident, in which Dimitriy's father was brutally beaten for days by paramilitary personnel, prompted the family to relocate to the United States in search of a better life.

At the same time, Dimitriy's mother had been diagnosed with cancer. And while the family hoped to find better medical care for her in the United States, she tragically passed away during the first year after arrival. Dimitriy was only fifteen years old. He was very close to his mother and the loss was devastating. Thus, as a young teenager, Dimitriy found himself in a new country, without community, and now without the person he loved most in the world and who had guided him his entire life. As reflected in the supporting materials, the loss of Dimitriy's mother—at a particularly critical juncture—altered the trajectory of his life. His mother had big dreams for him of completing college and finding a fulfilling and meaningful career path. Struggling with immense grief, Dimitriy relied upon drugs and alcohol to cope, and he fell in with the wrong peer group. It was not the life that he or his mother had hoped for him.

But Dimitriy persevered as best he could—graduating from high school and moving on to college.  Disappointingly, he left Pace University without completing his degree due to the need to work full-time to support his family (who affectionately refer to him as "Dima"), which was his top priority. He earned an honest living doing jobs like clearing snow from roofs, working in the food service industry, and even serving as a courtroom translator. Dimitriy's earnings always went

to assisting his close-knit family, and in particular, caring for his young daughter, Eliana, who is his greatest pride.

Dimitriy ultimately left his translator role and went on to work at Big Apple General Buyers ("Big Apple") in order to earn more money to support his family. Big Apple's business was comprised of pawn transactions, where Big Apple would provide an immediate cash loan to the customer, and consignment transactions, in which Big Apple would sell the item on the customer's behalf. Importantly, the vast majority of Big Apple's pawn and consignment business was legitimate. While working at Big Apple, Dimitriy also regretfully purchased items that he knew to be stolen. And while he did not know the details of when, where, and how they were stolen, Dimitriy knows that his conduct was wrong, and he accepts full responsibility for it. As a result of this criminal matter, he has come to understand the broader implications of the conduct he engaged in—knowingly selling stolen goods—and he is extremely remorseful for it.

But the grave mistake that Dimitriy made engaging in the offense conduct does not define him. As reflected in the letters of support submitted to Your Honor, Dimitriy is not a selfish, greedy, or materialistic person. Rather, he is a hardworking immigrant who is devoted to his family and supported them through pawn and consignment work that was largely legitimate. He is someone who spends his last dollar on "Sunday Funday" outings for his nieces and nephews to make sure they feel supported and loved. Someone who is extremely close with his father, who himself still works as a registered nurse at the age of 78. And above all, a devoted father to his 12-year-old daughter, Eliana. Indeed, until his arrest in this case, Dimitriy was extremely involved in Eliana's daily life, including by taking her to school every day. His sudden absence from her life has been shattering to them both.

At bottom, Dimitriy made a tremendous mistake engaging in the offense conduct here. But he has already suffered greatly as a result of this misstep—most significantly, being arrested suddenly and detained for the past year without an opportunity to say goodbye to his daughter or prepare her for what lies ahead. He is also facing a monumental forfeiture judgment and victim restitution as well as the other collateral consequences of conviction. Taking these facts into account, a punishment of the full guidelines range of 60 months is greater than what is necessary to accomplish the goals of sentencing. This is particularly so given that despite his circumstances Dimitriy still possesses hope and goals for the future. He has spent the past year reflecting and aspires to become a counselor to help others deal with the hardships he faced in his life—trauma, loss, grief, and drug abuse. Put simply, to use the remainder of his life in a manner of which he can be proud.

Accordingly, for all of these reasons, taking into account the factors to be considered under 18 U.S.C. § 3553(a)—including Dimitriy's history and characteristics, the nature and circumstances of the offense, the need for deterrence, societal protection and rehabilitation, we respectfully submit that a downward variance below the maximum penalty of 60 months is appropriate in this case. A lengthy sentence would further derail Dimitriy's life in irreparable ways, compounding what has already been a devastating and shameful mistake and further exact the consequences on those close to him such as his daughter, Eliana. Conversely, a sentence that imposes measured punishment would fairly account for his conduct while also taking into account his individualized circumstances, background, personal attributes, and ability to positively contribute to society in the future. We respectfully submit that a sentence below 60 months is appropriate here considering the § 3553(a) factors.

3

## DISCUSSION

### I.    The Sentencing Guidelines

To determine the defendant's sentence, the Court must follow a three-step process. *See Gall v. United States* 552 U.S. 38, 49 (2007) ("The district court should begin all sentencing proceedings by correctly calculating the applicable guideline range."). The Court must (1) calculate the applicable guidelines range, (2) determine the applicability of any relevant departures under the guidelines, and (3) then consider all factors set forth in 18 U.S.C. § 3553(a) to establish whether a variance is warranted. *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *United States v.Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).

In the Presentence Investigation Report ("PSR"), the Probation Department arrived at a total offense level of 25. PSR ¶ 34. Dimitriy agrees with this calculation, which was calculated as follows:[1]

| Offense Characteristic | Numerical Calculation | Guidelines Reference | PSR Reference |
|---|---|---|---|
| Base Offense Level | 6 | U.S.S.G §§ 2X1.1(a) & 2B1.1 | PSR ¶ 23 |
| Receipt of property between $1,500,000 - $3,500,000 | +16 | U.S.S.G. § 2B1.1(b)(1)(I) | PSR ¶ 23 |
| Ten or more victims | +2 | U.S.S.G. § 2B1.1(b)(2)(A)(i) | PSR ¶ 26 |
| Sophisticated means | +2 | U.S.S.G. § 2B1.1(b)(1)(C) | PSR ¶ 27 |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1(a) and (b) | PSR ¶¶ 32-33 |
| **Total Adjusted Offense Level** | 25 | | PSR ¶ 35 |
| **Criminal History Category** | II | | PSR ¶ 44 |
| **Guidelines Range** | 63 - 78 Months | | PSR ¶ 87 |
| **Statutory Maximum & Applicable Guidelines Range** | 60 months | | PSR ¶ 87 |

Based upon a total adjusted offense level of 25 and a criminal history category of II, the Guidelines range is 63 to 78 months; however the statutorily authorized maximum sentence is 60 months. PSR ¶ 87 Therefore, the applicable Guidelines range at step one and the starting point for the

---

[1] The plea agreement referenced an offense level of 23 because it incorporated an additional two-level reduction for zero-point offender. However, Probation has calculated that defendant accrues two criminal history points, which disqualifies defendant from the benefit of the zero-point offender reduction. *See* U.S.S.G. § 4C1.1(a).

Court's sentencing considerations is 60 months.

**II.      There are No Applicable Sentencing Departures at Step Two of the Analysis.**

Consistent with the parties' plea agreement, neither Dimitriy nor the government seek any sentencing departures.

**III.      Consideration of the § 3553(a) Factors Favors a Downward Variance.**

In the final step of the sentencing analysis, the Court must consider all factors set forth in 18 U.S.C. § 3553(a) to establish whether a variance is warranted. *See, e.g., Fernandez*, 443 F.3d at 26. In fashioning an appropriate sentence, the Court "shall impose a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing[.]" *Kimbrough v. United States*, 552, U.S. 85, 101 (2007) (citing 18 U.S.C. § 3553(a)). Most importantly, the sentencing judge shall consider the specific facts of the case in determining the appropriate sentence, and the guidelines "direct[] the judge to consider sentences other than imprisonment." *Gall*, 552 U.S. at 59. Thus, the Court treats the guidelines as a starting point and a factor in the ultimate sentence imposed and may exercise discretion and impose a lesser sentence when it determines "a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *United States v. Shy*, 538 F.3d 933, 937 (8th Cir. 2008) (quoting *Kimbrough*, 552 U.S. at 91); *see also United States v. Park*, 758 F.3d 193, 197 (2d Cir. 2014) (the guidelines range is the "'starting point and the initial benchmark'" in calculating a sentence). "Although the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

Section 3553(a) states that: "The court, in determining the particular sentence to be imposed, shall consider—, (1) the nature and circumstances of the offense and the history and

characteristics of the defendant; (2) the need for the sentence imposed . . . ; (3) the kinds of sentences available; (4) [the guidelines range]; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense." A court should impose a sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Park*, 758 F.3d at 197. In determining the appropriate sentence, the court may consider anything about the defendant's conduct or background, unless expressly prohibited. *See Pepper v. United States*, 562 U.S. 476, 488 (2011). Although sentencing courts must calculate the guidelines range, they should not "presume that the Guidelines range is reasonable," but instead "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. The Court must be guided always by the § 3553 factors to fashion the appropriate sentence.

In this case, there are many factors that favor a downward variance under § 3553(a): Dimitriy's unique personal circumstances, including his challenging upbringing in Georgia and his journey to the United States as an adolescent; the loss of his mother to cancer at a young age, from which he never recovered; his dedication to his family members, in particular his young daughter; his aims to help others in the community; and the fact that the vast majority of Big Apple's business operations were legitimate. All of these factors, independently and combined, support a downward variance pursuant to § 3553(a) and are consistent with a sentence below 60 months.

**A.      Dimitriy's History and Characteristics Warrant a Downward Variance.**

Under 18 U.S.C. § 3553(a)(1), the Court shall consider the history and characteristics of the defendant. This is a critical part of the Court's task at sentencing to evaluate the whole of the individual, making "an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. The facts presented here reveal an individual who is much more than the offense in this case. As the numerous letters addressed to Your Honor indicate, Dimitriy Nezhinskiy's life is defined by great trauma and loss in his early life. Yet despite those challenges, his adult life has been marked by an enduring commitment to family and hard work.

*1.      A Childhood Marked by Persecution, Profound Loss, and Displacement.*

Dimitriy's adolescence was shaped by instability and trauma at a level few teenagers experience. In short, his "honest, hardworking family [] immigrated to the United States from the former Soviet Republic of Georgia"[2] because of persecution directed at them for being Jewish. And while the family faced significant hardships in their home country, even "[s]ince arriving to the United States, it has been a difficult journey."[3]

Dimitriy was born and raised in Tbilisi, which is now the capital city of Georgia, and at the time was under the communist control of the Georgia Soviet Socialist Republic. PSR ¶ 52. Dimitriy's lived in his grandfather's home along with his mother, father, and sister. Despite both parents working, "his family struggled financially, and often than not did not have access to heat, electricity, or hot water." *Id.* As a child, Dimitriy saw "a military presence in his neighborhood" and "witnessed soldiers extorting local business owners." *Id.* Dimitriy's family experienced antisemitism frequently, and in 1994 while Dimitriy's father was "working as an overnight physician, armed men from the Mkhedrioni, a paramilitary group" entered his workplace "and

---

[2] Letter of Congregation of Georgian Jews, Exhibit 1.
[3] *Id.*

demanded prescription drugs." *Id.* at 53. And "[f]or approximately two days, the defendant's father was beat, sustaining a skull fracture." *Id.* This type of persecution in Georgia was a motivating factor for the family to relocate to the United States and served as a basis for the deferral of removal order Dimitriy received from Immigration Judge Joe. D. Miller on February 12, 2003. PSR ¶ 55.

In addition, while navigating the struggles of relocating to a new country, Dimitriy was also watching his mother battle cancer. The family hoped to find better care for her in the U.S. but within his first year in America, Dimitriy faced the most devastating loss of his life: "the untimely death of [his] mother . . . at a very young age."[4] His father wrote: "In our very first year, my wife passed away—Dmitry's mother. She was only 45 years old, and he was just 15."[5] Dimitriy "literally watched his mother's health deteriorate from chemotherapy" and "lost his best friend."[6] Dimitriy's cousin, Elene, vividly remembered visiting Dimitriy during his mother's illness and Dimitriy "doing his best to comfort and care for his mom while concealing his own pain."[7] The impact of that loss was profound. As his sister wrote, "that loss changed the course of his childhood."[8]

Arriving in a new country without language fluency, without community, and without a healthy mother, Dimitriy struggled deeply. One relative explained that moving to the United States at around 14 years old "when his mother was dying, left him vulnerable, resentful, and alone without much guidance."[9] His father was grieving and overwhelmed. The family had also lost Dimitriy's grandfather shortly thereafter. As his father put it, "from the very beginning, our life

---

[4] *Id.*
[5] Letter of Yuriy Nezhinskiy, Exhibit 2,
[6] Letter of Leah Vaysband, Exhibit 3.
[7] Letter of Elene Imnadze, Exhibit 4.
[8] Letter of Yana Gegechkori, Exhibit 5.
[9] Letter of Alex Gegechkori, Exhibit 6.

8

has not been easy,"[10] and the losses were "an enormous stress for a family that had just arrived in a new country."[11]

As stated in the PSR, following the death of Dimitriy's mother, Dimitriy began abusing drugs to cope and was arrested for the first time shortly thereafter. PSR ¶ 54. Dimitriy's drug use expanded over time from alcohol to marijuana to heroin. *Id.* ¶ 67. Dimitriy's father explained that "due to his wife's illness, he did not give [Dimitriy] enough attention and that problems began to assert themselves when [Dimitriy] was in high school." *Id.* His sister further explained that "in his search to belong, he fell in with the wrong crowds and began doing things he should not have."[12] Dimitriy's family does not minimize those mistakes but asks the Court to understand the context in which they arose: a teenager navigating persecution, immigration, parental death, and emotional instability all at once. Indeed, both of the criminal convictions that resulted in criminal history points were related to Dimitriy's struggles with alcohol and other substances. PSR ¶ 42-43. And both convictions date back almost ten years. *Id.*

Financial strain compounded the emotional upheaval, and while he finished high school, Dimitriy was unable to complete his college degree in the years that followed the loss of his mother. This was a huge disappointment to Dimitriy and he felt that he let his mother down, as she "strongly advocated that [Dimitriy] pursue higher education." PSR ¶ 54. But despite not graduating from college, Dimitriy worked hard to contribute and help the family. His father explained that "from the very beginning, [Dimitriy] started working—at first in the winter clearing snow from roofs, then on weekends working in the food service industry as a helper, all while doing everything he could to care for his elderly grandfather"[13] prior to his passing.

---

[10] Letter of Yuriy Nezhinskiym, Exhibit 2.
[11] *Id.*
[12] Letter of Yana Gegechkori, Exhibit 5.
[13] Letter of Yuriy Nezhinskiy, Exhibit 2.

These challenging early circumstances reveal a person not formed in stability and comfort, but a young immigrant affected by persecution, grief, displacement, and untreated trauma—a teenager who lost his mother at the very moment he needed her most. That early devastation is not an excuse for Dimitriy's conduct. But it helps explain the emotional and developmental landscape in which his life was shaped and the mistakes that followed.

  2. *Dimitriy's Dedication to His Hardworking, Immigrant Family.*

Despite a childhood of struggle and loss, Dimitriy did not retreat from responsibility. Instead, over time, he became what multiple family members and friends describe as a stabilizing and generous force in a multigenerational immigrant family.

His sister writes: "Dimitriy became the foundation of our family—the one who held us together when everything else felt uncertain. His presence is not just one part of our family; it is the glue that binds us."[14] His father, now nearly 79 years old and still working as a registered nurse, wrote: "My son—my boy—even though he is now a grown man, a husband, and a father, he is still my boy, who practically grew up without a mother's warmth . . . . He truly is kind, honest, hardworking, and for us—irreplaceable."[15] Over and over again, those who know him best describe a man whose life is centered not on extravagance or self-interest, but on providing for others. As one close friend observed, he is "a devoted and caring son, a loving father, a supportive brother, an affectionate uncle, and a very dear friend."[16] Another friend of over fifteen years described him simply as "reliable, [with] integrity, strong work ethic, kindness, generosity, and love for life and his community."[17]

---

[14] Letter of Yana Gegechkori, Exhibit 5.
[15] Letter of Yuriy Nezhinskiy, Exhibit 2.
[16] Letter of Natia Mikautadze, Exhibit 7.
[17] Letter of Mariam Ragovskaia, Exhibit 8.

Even during periods when he had little himself, Dimitriy gave what he could. His nephew recounts learning only recently that at a young age—"younger than I am now at 23"[18]—Dimitriy quietly gave the family babysitter an extra $100 each month so she could continue caring for him, "all without my parents knowing for many years."[19] In other words, Dimitriy was "[a] young man with nothing, yet still giving what he had to protect and support his family."[20] Others describe similar acts of instinctive selflessness. One family member wrote: "Dima once saved my life. Without thinking twice, he jumped into the water to save me when I was drowning. He didn't stop to assess the risk to himself—he just acted, purely out of love and instinct. That's who he is. Brave. Selfless."[21] That reflex, to step toward responsibility rather than away from it, appears repeatedly throughout the letters.

This is also reflected in Dimitriy's devotion to his elderly father and nieces and nephews. As one longtime family friend observed, at family gatherings, Dimitriy always "ensures that everyone, especially children and the elderly, are comfortable before he sits down to enjoy his own meal," and that he will "leave behind his own enjoyment if he feels his father is tired and ready to go home."[22] Dimitriy similarly spends countless hours taking his daughter and her cousins to "adventure parks and swimming pools,"[23] outings they would affectionately call "Sunday Fun days."[24] These day-trips were filled with food and ice cream and "cherish[ed]" by the children Dimitriy included.[25] As one family member wrote, "I always thought to myself, 'wow, what an amazing uncle I have. I see how much he cares about us and especially his baby girl!'"[26]

---

[18] Letter of Alex Gegechkori, Exhibit 6.
[19] Id.
[20] Id.
[21] Letter of Kathy Okruashvili, Exhibit 9.
[22] Letter of Medea Skupinsky, Exhibit 10.
[23] Letter of Yair Vaysband, Exhibit 11.
[24] Id.
[25] Id.
[26] Id.

11

This is not the portrait of a man focused on status or personal gain. It is a man whose identity is deeply intertwined with caring for others—an immigrant son who stepped into adulthood early, a brother who became an anchor to the rest of the family, and a father who is present, attentive, and devoted to his daughter. As one family friend summarized: "Being around Dima brings a sense of safety to everyone. He has a natural ability to look after those around him."[27] That pattern of loyalty, responsibility, and showing up for others defines the man his family and community know.

### 3.    The Impact on Dimitriy's Young Daughter.

Above all else, Dimitriy's life centers around his daughter, Eliana. Relatives consistently describe the depth of their bond. As one family member wrote: "The love he has for her is immeasurable. You can see it in every little thing he does—how he speaks about her, how he shows up for her."[28] Another observed: "[H]e cherishes the time spent together. He makes all the effort to be present in her life and to make her happy."[29]

Eliana Nezhinskiy is only eleven years old. In her letter to the Court, she described the effect of her father's absence. She wrote: "My dad is the most important, most influential person in my life. He always makes me laugh, even when I'm sad. He helps me with my homework, reads me stories, and tells me that I can be anything I want when I grow up."[30] She explained that she feels "safe and loved" when she is with him, and that since his incarceration, "the house is too quiet."[31] She continued: "I often cry at nights, because I just want him to hug me and tell me everything will be okay."[32] She sees other children with their fathers and stated simply, "it makes

---

[27] Letter of Natia Mikautadze, Exhibit 7.
[28] Letter of Kathy Okruashvili, Exhibit 9.
[29] Letter of Victoria Khaitov, Exhibit 12.
[30] Letter of Eliana Nezhinskiy, Exhibit 13.
[31] *Id.*
[32] *Id.*

me sad."[33] And she implores the Court to "please let [her] dad come home soon."[34] Her words reflect the heartbreaking experience of a child navigating the fear and confusion that stems from the sudden absence of a parent.

The impact of Dimitriy's incarceration is compounded by the medical condition of Eliana's mother. As the PSR states, her mother suffers from a significant heart condition that currently prevents her from working in her prior career as a nurse. PSR ¶ 56. Eliana's mother also suffers from lymphoma, which is also seriously impacting her health and prognosis. Family members describe the strain this has placed on the household. As his cousin writes, Dimitriy worries deeply about his daughter's well-being "especially since her mother has been seriously unwell recently," and fears that Eliana could relive "his childhood experience of not having a parent by her side during these critical formation years."[35]

Other relatives report observable changes in Eliana during this period. One family member explains: "Eliana seems very sad and distraught . . . . She's losing weight due to lack of appetite and she's not really in the mood to hang out with us anymore. She really misses her father and asks to be left alone. This is disturbing to see."[36] Dimitriy's sister writes that her father's absence has left "a painful void in her life at a critical stage of her growth,"[37] and that "[t]he confusion, the heartbreak, and the depression from not having him here have not eased—they remain as raw and as heavy as the day he was taken from us, understandably so because of his actions."[38]

As discussed above, Dimitriy lost his own mother as a teenager. That trauma shaped his adolescence and the course of his life. The possibility that his daughter may now grow up during

---

[33] *Id.*
[34] *Id.*
[35] Letter of Elene Imnadze, Exhibit 4.
[36] Letter of Victoria Khaitov, Exhibit 12.
[37] Letter of Yana Gegechkori, Exhibit 5.
[38] *Id.*

these important years without the presence of her father weighs heavily on him. Section 3553(a) permits consideration of these real and foreseeable consequences of a sentence—particularly on a minor child living in a medically fragile household. The length of the sentence imposed here will meaningfully shape the stability, emotional security, and development of Dimitriy's vulnerable eleven-year-old daughter. We ask that the Court employ leniency on this basis.

4.    *Dimitriy's Commitment to Using His Experience to Serve Others.*

The letters of support submitted to the Court do not deny the seriousness of Dimitriy's conduct. Rather, they emphasize that his missteps do not reflect Dimitriy's true character, rehabilitative potential, and current goals. In particular, it is significant that Dimitriy has used the past year in federal detention to thoughtfully reflect on both his past mistakes and his plans for the future.

Those who have known Dimitriy for decades describe resilience, work ethic, and a demonstrated capacity to persevere. As one longtime friend wrote, "I strongly believe that Dima has the ability to rebuild his life and contribute positively to society if given a second chance," describing him as "honest, dependable, and kind."[39] Similarly, a friend of over thirty years emphasized that beyond personal character, Dimitriy is "a profoundly inspiring individual"[40] whose determination encourages others. Even during periods of personal struggle, Dimitriy has shown the ability to reflect and redirect. As his sister explained, "Though his history may not immediately reflect the picture of an outstanding man" he is someone who has "always tried to do better, to learn from his mistakes."[41]

---

[39] Letter of Nana Yenukashvili, Exhibit 14.
[40] Letter of Alexandre (Sandro) Ragovski, Exhibit 15.
[41] Letter of Yana Gegechkori, Exhibit 5.

Importantly here, Dimitriy has concrete goals for his future. He wishes to become a counselor to help others struggling with grief and addiction as he has in his past, through credentialing as a Credentialed Alcoholism and Substance Abuse Counselor ("CASAC"), Certified Recovery Peer Advocate ("CRPA"), or the like. These are not small aspirations. CASAC certification in New York requires formal education hours, supervised work experience, and passage of a comprehensive examination. CRPA certification similarly requires structured training, supervised experience, and examination, allowing individuals with lived recovery experience to provide non-clinical peer support in treatment and reentry settings. Both pathways involve ethical competency evaluations and ongoing continuing education requirements.

Dimitriy's interest in these programs is rooted in his own experience. He understands, firsthand, how untreated grief, displacement, and addiction can alter the trajectory of a young person's life and has a sincere desire to assist others facing similar challenges. He believes that had he received fulsome support after his mother's death, his path may have been different—both as to the use of alcohol and drugs and his run-ins with the law. He now hopes to provide that support to others. This aspiration aligns with the consistent description of him throughout the letters: a man with "a natural ability to look after those around him"[42] "whose kindness and generosity have impacted so many."[43]

*       *       *

In sum, the record here reflects a man integral to his family and community, surrounded by accountability, and motivated by a desire to transform his own painful experiences into service for others. A downward variance would recognize the realities of Dimitriy's challenging past as well as the fact that he is capable of growth, responsibility, and positive contribution upon release.

---

[42] Letter of Natia Mikautadze, Exhibit 7.
[43] Letter of Andrew Gegechkori, Exhibit 16.

We ask that the Court impose a sufficient sentence to satisfy the aims of § 3553(a) without extinguishing hope for the future.

> **B.    The Nature and Circumstances of the Offense Justify a Downward Variance.**

Section 3553(a)(1) requires the Court to consider the nature and circumstances of the offense in determining a sentence to be imposed. We respectfully submit that the nature and circumstances here warrant leniency.

Specifically, the vast majority of Big Apple's business was comprised of legitimate pawn and consignment transactions. In a pawn transaction, Big Apple would provide an immediate cash loan to the customer, and the pawned item would act as collateral; the customer could thereafter reclaim the item or forfeit ownership if the loan were not repaid. In a consignment deal, Big Apple would sell the item on the customer's behalf and pay the customer only after a completed sale. Here, it is evident from the materials seized by the government that Big Apple was operating largely in good faith. Indeed, the materials taken during the government's search of Big Apple include numerous binders filled with paperwork for customers pawning or consigning their items, including photographs of the items and identification and contact information for the customer. In fact, multiple customers have contacted the Court and/or the government regarding their legitimate business transactions with Big Apple and their desire to reclaim their items.

For example, Isaiah Thompson wrote to Your Honor and stated that he had left his jewelry at Big Apple shortly before "the government raided the defendant's business . . . and took possession of all the goods that were at the location." ECF #69. He explained that he had engaged in pawn transactions with Big Apple in the past without issue and that he intended, as he had done previously, to pay back the loan and retrieve his personal property. *Id.* He emphasized that his "property is not in any way related to any criminal activity," that he has his "pledge ticket with his name on it" to identify his jewelry, which he needs to get back as it "serve[s] as an economic

16

security means." ECF #69. Dimitriy also has legitimate business contacts in the diamond district who left their valuables in his possession shortly before the government's raid. At least one of those vendors has contacted defense counsel and the government, desperate to get their valuables back. These examples emphasize Big Apple's legitimate business but also raise a broader issue—that many of the items the government seized from Big Apple may be entirely disconnected from the criminal conduct in this case.[44]

In addition, it is important to note that while the PSR focuses heavily on Big Apple's connections to "South American Theft Groups" ("SATG"), which we have little doubt exist and were directly responsible for the thefts, these groups were not named in the indictment, there is no discovery clearly linking Dimitriy or his co-defendant to these groups (other than diffuse links to the property they stole), and Dimitriy did not admit to having a connection to any such group as part of his guilty plea. This is because, in fact, Dimitriy does not have any clear connection to any SATG. As Dimitriy stated at his guilty plea:

> Between November 2020 and the date of my arrest, I owned and operated a pawn shop located in New York City. During the operation of my pawn shop during this time, I agreed with others to purchase property that I knew was stolen, including jewelry, watches, clothing, and other luxury items. While I did not have specific knowledge of exactly how my co-conspirators obtained these items, I knew they were stolen and I agreed to buy them anyway. I have now become aware as the result of this prosecution that many of the items were stolen from people's homes and were transported across state lines. I took these actions knowingly and intentionally and I am pleading guilty because I am, in fact, guilty of this offense. I am very sorry for my actions. Most of my business was completely legitimate and it was a good business. I deeply regret getting involved in these actions and I want to apologize for my actions. Thank you.

---

[44] Though the defendant cannot benefit from it (and actually could stand to be harmed by it), he has advocated extensively in this case for an orderly process for third parties to identify and claim their goods from the items seized by the government. Recently, defendant made a request for the government to hold open the period for third parties to claim their property from the seized items even after his sentencing hearing in this matter. The government has stated that it is still processing evidence, which would permit third parties to continue to submit claims, but did not commit to any time period for claimants to do so.

ECF #60, Nezhinskiy Plea Tr. at 22-23. And when Your Honor asked whether the government wished to add anything to the factual allocution, the government declined. Juan Villar's factual basis was even less extensive and again contained no reference to SATGs. He stated: "I pretty much received stolen property that I knew was stolen and that was brought—it was from out of state and traveled through Queens. I purchased watches, jewelry, bags. That's mainly it." ECF #59, Villar Plea Tr. at 23. Again, the government declined to expand on these facts.

Thus, it is clear that Big Apple ran a largely legitimate business in good faith. And as Dimitriy stated in his plea allocution, while he knew some of the items they agreed to sell were stolen, he did not have specific knowledge of how they were obtained. Dimitriy's conduct is criminal and obviously irresponsible. But there is no evidence, as the government has suggested throughout this case, that ties Dimitriy's economic crime knowingly to dangerous home-invasion burglaries and robberies. We say this not to minimize Dimitriy's conduct but to ensure that his sentence is based upon his conduct and not the conduct of others of which Dimitriy had no knowledge or control. These facts warrant a sentence below the guidelines of 60 months.

### C.    A Lengthy Sentence Is Not Necessary for Deterrence, Societal Protection, or Rehabilitation.

Section 3553(a)(2) instructs courts to consider the need for the sentence imposed to: (A) "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense;" (B) "afford adequate deterrence to criminal conduct;" (C) "protect the public from further crimes of the defendant;" and (D) "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Here, a sentence below the guidelines range of 60 months would satisfy all of these considerations and provide a sentence that is sufficient but not greater than necessary to achieve these important sentencing goals.

Specific deterrence does not require a lengthy sentence here. Dimitriy has been detained since his arrest and therefore has already experienced the most severe consequences of federal prosecution—immediate incarceration and separation from his eleven-year-old daughter; prior to his arrest, he played a central role in her life, including taking her to school every day. Indeed, when Dimitriy was arrested and detained, he did not even have the opportunity to say goodbye to her. And that separation has now lasted more than a year. Further, the business associated with this case, Big Apple, is now defunct. There is no ongoing enterprise, no continuing scheme, and no infrastructure through which the conduct could be repeated. Dimitriy is also facing a staggering forfeiture judgment—$2,595,798.19—as well as victim restitution. In short, the arrest, conviction, detention, and financial consequences in this case have reinforced the seriousness of his conduct in a way that makes a lengthy period of incarceration unnecessary to ensure he does not reoffend.

For similar reasons, general deterrence does not require imposition of the maximum penalty. Dimitriy has lost his freedom, his business, and his financial resources. His reputation within his close-knit immigrant family and community has been damaged due to the public nature of the charges, his guilty plea and conviction, forfeiture, and imprisonment, all of which sends a clear and powerful message to others. A variance below 60 months would not diminish that effect.

Nor does the public require additional protection from Dimitriy. He is middle-aged, integral to his family, and the father of a minor child whose stability depends upon his lawful and productive future. Upon release, he will remain subject to supervised release and substantial financial obligations, both of which significantly reduce any risk of recidivism. He is not violent and any concerns regarding the danger posed by the offense conduct have been eradicated as Big Apple is no longer operational. In addition, the immigration consequences of this conviction

remain uncertain. Although Dimitriy has been and is lawfully present in the United States,[45] the collateral immigration implications of a federal felony conviction are unpredictable and may carry serious consequences. That uncertainty itself represents an additional layer of deterrence and restraint.

Finally, rehabilitation does not justify a lengthy term of imprisonment. While a court must consider a defendant's need for rehabilitation, it "may not carry out that goal by imprisonment." *United States v. Manzella*, 475 F.3d 152, 158 (3d Cir. 2007) (emphasis in original) (citing 18 U.S.C. § 3582(a)). As discussed above, Dimitriy has a strong desire to use the remainder of his life productively and lawfully, by pursuing training to become a counselor, including through programs such as CASAC or CRPA. These pathways are structured, meaningful, and consistent with his motivation to assist individuals struggling with grief, addiction, and reentry challenges—experiences he understands personally. A sentence below the statutory maximum would allow him contribute meaningfully in this capacity and give back to others through service.

A final point regarding Dimitriy's pretrial detention is warranted as well. Since his arrest, Dimitriy has been housed at the Metropolitan Detention Center (MDC) in Brooklyn, the administrative pretrial facility at which most defendants charged in the Eastern and Southern Districts of New York are housed. Several courts have considered the "[t]he harshness of incarceration at MDC as a relevant factor" under 3553(a). *See United States v. Kaziu*, 768 F. Supp. 3d 477, 484-85 (E.D.N.Y. 2025) (quoting *United States v. Martinez-Rojas*, 1:15-CR-00348, 2023 WL 4867433, at *6 (E.D.N.Y. July 31, 2023)). As the Court has noted, "[t]he horrible conditions

---

[45] Footnote 1 of the PSR states that "defendant has an outstanding warrant of removal" but that the "warrant was not lodged as a detainer[.]" PSR fn 1. We are not aware of any immigration removal orders. Furthermore, it is our understanding that while Dimitriy is not a U.S. citizen, he is and has been present in the U.S. legally for decades. Indeed, on February 12, 2003, Immigration Judge Joe. D. Miller granted Dimitriy deferral of removal, which we understand was based on Dimitriy's persecution in his home country of Georgia for being Jewish. *See* PSR ¶ 55. In addition, as the PSR noted in **footnote 2**, Dimitriy possessed a valid work authorization card that has since expired while he was detained in this case.

at MDC, which still regrettably exist, amplify the retributive power of a sentence. *Id.*; *see also United States v. Collucci*, 743 F. Supp. 3d 452, 455, 461-62 (E.D.N.Y. 2024) (collecting cases involving violence and threats of violence at the MDC and ordering that defendants' sentence should be converted to home confinement should defendant be designated to serve his sentence at the MDC). The conditions at the MDC "make time spent there "essentially the equivalent of either time and half or two times what would ordinarily be served."" *United States v. Parish*, No. 13-CR-829 (AY), 2024 WL 3904626, at *6, (S.D.N.Y. Aug. 22, 2024) (quoting *United States v. Gonzalez*, No. 18-Cr-669 (S.D.N.Y. Apr. 2, 2021)); Thus, "it is routine for judges in . . . the Eastern District [of New York] to give reduced sentences to defendants based on the[se] conditions." *Id.* (quoting *United States v. Chavez*, 710 F. Supp. 3d 227, 229 (S.D.N.Y. 2024)). Based on these cases, it would also be appropriate for the Court to vary downward based on the fact that Dimitriy has been detained since his arrest at the MDC for a lengthy period of time.

A sentence below 60 months would reflect the seriousness of the offense, provide just punishment, deter future misconduct, and protect the public. Taken together, the purposes of sentencing under § 3553(a)(2) are fully satisfied without imposing the maximum guidelines term.

## **CONCLUSION**

Based on all of the foregoing—including Dimitriy's background and personal characteristics, his challenging and traumatic past, the nature and circumstances of the offense, his close relationship with his family and young daughter, and his strong desire to contribute positively to society in the future—Dimitriy respectfully requests leniency in the imposition of his sentence. We respectfully request that the Court impose a sentence below the guidelines range of 60 months.

Respectfully submitted,

ABELL ESKEW LANDAU LLP

*/s/David M. Eskew*

By: DAVID M. ESKEW
256 Fifth Avenue, 5th Floor
New York, NY 10001