UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
UNITED STATES OF AMERICA,                   :
                                            :
        v.                                  :        **MEMORANDUM AND ORDER**
                                            :        25-CR-40 (WFK)
DIMITRIY NEZHINSKIY,                        :
                                            :
                Defendant.                  :
-------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On July 18, 2025, Dimitriy Nezhinskiy ("Defendant") pled guilty to one count of conspiracy to receive stolen property, in violation of 18 U.S.C. § 371, to wit, a violation of 18 U.S.C. § 2315. Plea Agreement (the "Plea") ¶ 1, ECF No. 63.[1]  The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a).  For the reasons set forth below, Defendant is hereby sentenced to forty-six (46) months' incarceration; one (1) year of supervised release with both the standard and special conditions of supervision; restitution in accordance with the forthcoming Order of Restitution; forfeiture of U.S. currency and items identified in the Order of Forfeiture, ECF No. 64; and a $100.00 mandatory special assessment.

## I.      Background

### Factual Background

While operating the New York City pawn shop Big Apple General Buyers ("Big Apple") between November 2020 and January 2025, Defendant and Juan Villar ("Villar," together with Defendant, "Defendants") conspired together and with South American Theft Groups (the "SATGs") "to receive, possess, conceal, store, barter, sell, and dispose goods, merchandise and money, of the value of $5,000 or more[.]"  Presentence Investigation Rep. (the "PSR") ¶¶ 1, 5, ECF No. 65.

To serve as the SATGs' fence, Defendants coached the groups as they "traveled across the United States engaging in crime tourism [and] committing burglaries" by "targeting jewelry

---

[1] Citations are to the docket in *United States v. Nezhinskiy, et al.*, 25-CR-40. Page pincites refer to the ECF page numbers assigned to a filing where available, and where no ECF heading is present, to the page numbers listed in the original filing.

vendors or wealthier neighborhoods, including the homes of various prominent athletes[.]" *Id.* ¶¶ 5–6; *see also Fence, Black's Law Dictionary* (12th ed. 2024) (A "fence" is "[s]omeone who receives stolen goods, [usually] with the intent to sell them in a legitimate market"). Although Defendants did not recruit any particular SATGs, "smaller fences and other SATG[s] referred SATG[s] to [Big Apple]" given Defendants' ability "to purchase upwards of $300,000[.00] in stolen goods in a single transaction" and to pay with cash. PSR ¶ 7.

The SATGs proceeded to take "any high-end items they could potentially resell[,]" and were further instructed by Defendants "to steal items outside of New York to make it easier for [Defendants] to resell and harder for law enforcement to trace." *Id.* ¶ 6. As a result of Defendants' preference for out-of-state theft, the items "crossed [a] State or United States boundary after being stolen, unlawfully converted or taken[.]" *Id.* ¶ 1; Indictment ¶ 1, ECF No. 1. The stolen goods identified as part of Defendants' scheme can be categorized as follows: Jewelry, watches, handbags, and miscellaneous luxury items. *See* PSR ¶ 1.

Defendant remained "the main point of contact for [the] SATG[s]" throughout the scheme while Villar "primarily served as the backup[.]" *Id.* ¶ 8. To avoid detection, Defendant, who the SATGs knew as "Ruso," "met [the] SATG[s] at alternate locations and made transactions outside of [Big Apple]." *Id.*

At least six separate burglaries were conducted by SATGs across the United States and prior to Defendants' arrests. *See id.* ¶¶ 10–11. At least five of the SATGs' "theft crimes across the United States between 2020 and 2025" involved Defendants' operation. *Id.* ¶ 11. However, only Defendant was in contact with "at least two members of a four-man burglary crew involved in the December 9, 2024, burglary of a high-profile athlete in Ohio[.]" *Id.* ¶ 10. Defendant spoke with the crew members "less than a week prior to the commission of the burglary[.]" *Id.*

2

Defendants' criminal activity was discovered when "law enforcement utilized undercover officers" between October 2022 and January 2024 to "conduct[] controlled sales of purported stolen property, including high end handbags and luxury accessories, to either [Defendant] or Villar, or both, at [Big Apple]." *Id.* ¶ 9. Evidence exists documenting Defendants' "recei[pt] [of] at least $2,595,798.19 worth of stolen property" between December 2020 and February 2023. *Id.* ¶ 13.

*Procedural History*

On February 4, 2025, the Federal Bureau of Investigation arrested Defendant at his New Jersey residence. *See id.* ¶ 17. While executing a search warrant that day at Big Apple, law enforcement found "large quantities of stolen property including dozens of high-end watches and jewelry, large quantities of cash, and marijuana." *Id.* ¶ 12. Following Defendant's arrest, additional stolen goods were discovered in storage units belonging to Defendants in New Jersey. *See id.*

On January 30, 2025, a U.S. Grand Jury returned an Indictment asserting four counts against Defendants: Count One against Defendants alleged conspiracy to receive stolen property in violation of 18 U.S.C. § 371; Count Two against Defendants alleged receipt of stolen property in violation of 18 U.S.C. § 2315; and Counts Three and Four against Defendant alleged receipt of stolen property in violation of 18 U.S.C. § 2315. *See* Indictment ¶¶ 1–5. The Indictment also raised criminal forfeiture allegations pertaining to all counts. *See id.* ¶¶ 6–7.

On July 18, 2025, Defendant pled guilty to Count One of the Indictment, charging him with conspiracy to receive stolen property from November 2020 to August 2023 in violation of 18 U.S.C. § 371. *See* Plea ¶ 1; *see also* Indictment ¶¶ 1–2. Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposes a term of

sixty (60) months' incarceration or below. *See* Plea ¶ 4. The Government agreed "no further criminal charges [would] be brought against [Defendant] for conspiring to and actually receiving and possessing stolen property between November 2020 and February 2025." *Id.* ¶ 5(a). Additionally, the Government agreed to dismiss the remaining counts of the Indictment with prejudice as to Defendant at the time of sentencing. *See id.*

On June 16, 2025, Villar pled guilty to Count One of the Indictment. *See* Villar Plea Agreement ¶ 1, ECF No. 55. On February 13, 2026, he was sentenced to forty-six months' incarceration to be followed by one year of supervised release with both the standard and special conditions. *See* Mem. & Ord. at 1, ECF No. 83.

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the U.S. Federal Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G.") operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state, in open court, the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

### III.    Analysis

#### A. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1).

##### 1.    *Family and Personal Background*

Defendant was born on April 11, 1981, in Tbilisi, Georgia, to the union of his father, Yuriy Nezhinskiy ("Yuriy"), and his mother, Liana Nezhinskiy (née Adzhamelashvili). *See* PSR ¶ 49. Defendant's mother passed away in 1997 "following a diagnosis of carcinoma." *Id*. Prior to her passing, Defendant's mother "was employed as an English teacher . . . in Georgia." *Id*. Defendant's father, now seventy-eight years old, "is employed as a registered nurse, and despite a history of prostate cancer, . . . [is] in stable health." *Id*. Defendant has one older sibling named Yana Gegechkori ("Gregechkori"). *See id.* ¶ 50. At fifty-two years of age, Gregechkori "is employed as an executive assistant" and "resides in . . . New Jersey[] with her husband and two children." *Id*.

5

What is today the country of Georgia was known as the Georgian Soviet Socialist Republic from 1921 to 1991. *See id.* ¶ 52. This soviet regime "was marked by the implementation of communist policies[,]" and antisemitic sentiment as reported by Defendant and his family. *Id.*; Def's Sent'g Mem. at 7, ECF No. 86 (citing Lett. of Congregation of Georgian Jews) (Defendant informs how his family "immigrated to the United States . . . because of persecution directed at them for being Jewish."). Prior to his immigration at the age of fourteen, "[Defendant's] family struggled financially, and often than not did not have access to heat, electricity, or hot water" while in Georgia. PSR ¶ 52. Antisemitic views were so prominent in Tbilisi that Defendant's father was once beaten for nearly two days. *Id.* ¶ 53. This occurred after "armed men from the Mkhedrioni, a paramilitary group, entered [Defendant's father's] workplace," where he was employed as an overnight physician, "and demanded prescription drugs." *Id.* (internal quotation marks omitted).

Defendant and his mother shared a close relationship. *See id.* ¶ 49. One of the family's primary reasons for immigration was "to seek better healthcare for his mother." *Id.* ¶ 54. Defendant attributes his struggle assimilating to American life to his mother's death. Defendant's family hoped, by relocating to the United States, she would receive better care for her cancer diagnosis. *Id.* at 8. However, less than a year after leaving Tbilisi, Defendant's mother passed away at the age of forty-five. *See id.*

Defendant wed Yesenia Teplitskaya ("Teplitskaya") in 2009 and they separated in 2023 "due to financial issues." PSR ¶ 56. "Teplitskaya was previously employed as a nurse but is currently unemployed as she has a significant heart condition." *Id.* The couple share one eleven-year-old daughter named Eliana Nezhinskiy ("Eliana"). *See id.* ¶¶ 56–57. Eliana states Defendant "is the most important, most influential person in [her] life." Def's Sent'g Mem. at 12

6

(citing Lett. of Eliana). Due to Teplitskaya's poor health, Defendant is fearful Eliana will be forced to relive the events of his own childhood: "[N]ot having a parent by her side during [her] critical formation years" and "living in a medically fragile household." *Id*. at 13–14 (citing Lett. of Elene Immadze). Prior to his arrest, Defendant lived with an unnamed ex-girlfriend in New Jersey whom he currently has no contact with. PSR ¶ 58.

An immigration judge granted Defendant "a deferral of removal" on February 12, 2003. *Id*. ¶ 55. Nevertheless, records from U.S. Immigration and Customs Enforcement "indicate . . . [Defendant] has an outstanding warrant of removal" but the department "has not lodged a detainer against [him] as of [December 4, 2025]." *Id*.

### 2.    *Educational and Employment History*

Defendant earned his high school diploma from Forest Hills High School in 1997. *See* PSR ¶ 70. After high school, Defendant earned an associate's degree from LaGuardia Community College in December 2008. *See id*. ¶¶ 70–71. From 2008 until 2025, Defendant completed forty credits at Pace University. *Id*. However, "[d]ue to financial limitations . . . [Defendant] was unable to finish his degree" and ceased his attendance in 2025. *Id*. ¶¶ 70, 72.

Defendant "is fluent in English, Georgian, and Russian." *Id*. ¶ 73. This is evidenced by Defendant's first record of employment as a part-time "Russian and Georgian interpreter within the New York Unified Court System" between 2005 and 2008. *Id*. ¶ 76. Defendant earned approximately $55.00 per hour. *See id*. Defendant's resignation was due to "need[ing] to be present full-time in the diamond district in Manhattan." *Id*.

From 2007 to 2022, Defendant operated Manhattan Gold and Diamond Buyers Inc., in New York City. *See id*. ¶ 75. Defendant earned approximately $100,000.00 annually as "the

sole employee of this business[.]" *Id.* His business "ultimately closed after falling behind on interest payments." *Id.*

Defendant's last record of employment prior to his arrest was as a "Consultant" to Big Apple, the business referenced in the instant case. *See id.* ¶ 74. While Villar "maintained 100% ownership of [Big Apple] . . . [Defendant] served as the primary point of contact with respect to receiving the stolen property." *Id.* Defendant reported earnings of "approximately $7,000[.00] per month on a cash basis, splitting revenue with Villar after subtracting business expenses." *Id.* Defendant's employment naturally halted upon his arrest pursuant to the instant offense conduct on February 4, 2025. *See id.*

### 3. *Prior Convictions*

Defendant had six adult criminal convictions prior to the instant case. On August 22, 2000, Defendant was arrested following "a traffic stop of a vehicle being driven by [Defendant] with two passengers." *Id.* ¶ 38. "[A] search of [Defendant]" by the arresting officer "yielded two transfer checks with forged signatures." *Id.* The Long Beach Court convicted Defendant of possession of forged instruments in the third degree, a Class A misdemeanor. *See id.* Defendant was sentenced to three years of probation on January 31, 2001, but was discharged early in May 2002. *See id.*

On November 29, 2000, Defendant was arrested when he, "alongside a coconspirator, forcibly stole unspecified property from a convenience store" earlier that day. *Id.* ¶ 39. The Nassau County Court convicted Defendant of disorderly conduct, a violation. *See id.* Defendant was sentenced to one-year conditional discharge on March 9, 2001. *See id.*

On May 11, 2001, Defendant was arrested for stealing "merchandise from a . . . cosmetic store." *Id.* ¶ 40. The New York County Criminal Court convicted Defendant of petit larceny, a

Class A misdemeanor. *See id.* Defendant was sentenced to one-year conditional discharge on October 3, 2001. *See id.*

On November 30, 2001, Defendant was arrested upon the belief he was "involved with the Russian Mafia" when he, "alongside a coconspirator, forcibly removed and stole a gold necklace and wedding ring from a female victim's person." *Id.* ¶ 41. The Nassau County Court convicted Defendant of robbery in the second degree, a Class C felony. *See id.* Defendant was sentenced to forty-two months' incarceration on March 28, 2002, and was released to parole supervision on November 27, 2004. *See id.* Defendant was resentenced to forty-two months' incarceration on November 19, 2008, and was ultimately discharged from parole supervision on November 26, 2009. *See id.*

On October 8, 2016, Defendant was arrested after being found "unsteady on his feet with slurred speech and watery and bloodshot eyes" after being woken from "sleeping behind the wheel of a vehicle which was double parked with the engine running." *Id.* ¶ 42. The Queens County Criminal Court convicted Defendant of driving while his ability was impaired by the consumption of alcohol, an infraction. *See id.* Defendant was sentenced to one-year conditional discharge, had his driver's license suspended, and was ordered to pay a fine and participate in an impaired driver program. *See id.*

On September 22, 2017, Defendant was arrested at an amusement park when he was "found to be in possession of what [Defendant] admitted [to] being cocaine mixed with Xanax." *Id.* ¶ 43. The Ocean County Superior Court convicted Defendant of wandering in a public place to obtain/distribute drugs, a misdemeanor. *See id.* Defendant was ordered to pay a fine for this misdemeanor on January 23, 2018. *See id.*

9

### 4.    *Physical and Mental Health*

Approximately ten years ago, Defendant was diagnosed with gout which he has managed with medication. *Id.* ¶ 62. Additionally, Defendant suffers from sleep apnea. *Id.* ¶ 63. He has been treated for both conditions by medical staff at the Metropolitan Detention Center, Brooklyn throughout his incarceration. *See id.* ¶¶ 62–63.

Defendant "has never been diagnosed with a mental health condition." *Id.* ¶ 65. However, he "attended bereavement therapy for approximately six months" following his mother's death and "report[s] a history of anxiety and panic attacks as an adult." *Id.* Although never formally prescribed to him, Defendant "purchased Xanax from a friend to treat his panic attacks." *Id.*

### 5.    *Substance Abuse*

Although none was reported by his wife, Defendant reports "a history of substance abuse dating back to age 13." *Id.* ¶¶ 67, 69. Outside of an eight-year period of sobriety simultaneous with the duration of his sentence for robbery in the second degree, the substances Defendant engaged with were alcohol, marijuana, heroin, and most recently, suboxone. *See id.* ¶¶ 67–68.

### 6.    *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense. *See supra* Part I.

## B. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant

10

with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. Defendants' "creat[ion of] a cash-based marketplace for stolen items . . . motivated individuals to engage in a nationwide series of burglaries and thefts." Gov't Sent'g Mem. at 4. This "criminal conduct was serious and directly enabled others to engage in conduct that created a substantial risk to human life." *Id.*

The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

### C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3). Defendant pled guilty to one count of conspiracy to receive stolen property, in violation of 18 U.S.C. § 371. *See* Plea ¶ 1.

Defendant faces a maximum term of five years' imprisonment and no minimum term. *See* 18 U.S.C. § 371. Defendant also faces a maximum term of three years of supervised release. *See* 18 U.S.C. §§ 3583(b)(2), 3559(a)(4). If a condition of release is violated, Defendant may be sentenced to up to two years of imprisonment without credit for pre-release imprisonment or time previously served on post-release supervision. *See* 18 U.S.C. § 3583(e). Defendant is eligible for a term of probation of one to five years. *See* 18 U.S.C. § 3561(c)(1). Unless extraordinary circumstances exist, the Court must impose one of the following as a condition of probation: a fine, restitution, or period of community service. *See* 18 U.S.C. § 3563(a)(2).

11

**D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense**

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

The Government and Defendant stipulated to a Total Adjusted Offense Level of 23 in the Plea.[2]  Plea. ¶ 2.

The applicable provision of the Guidelines is Section 2X1.1, which directs the Court to apply the "base offense level for the substantive offense." U.S.S.G. § 2X1.1(a).  Here, the Base Offense Level for the substantive offense—receipt of stolen goods—is found in U.S.S.G. § 2B1.1, which covers, *inter alia*, forms of theft.  *See* U.S.S.G. § 2B1.1.  Under U.S.S.G. § 2B1.1(a)(2), Defendant has a Base Offense Level of 6.  *See id.*; PSR ¶ 23; Gov't Sent'g Mem. at 3, ECF No. 87; Def. Sent'g Mem. at 4, ECF No. 86; Plea ¶ 2.

The parties agree certain adjustments should apply to Defendant.  First, U.S.S.G. § 2B1.1(b)(1)(I) adds 16 levels because the total loss stemming from the offense—based on the parties' estimates and the Plea—was greater than $1,500,000.00, but less than $3,500,000.00.  U.S.S.G. § 2B1.1(b)(1)(I); PSR ¶ 24; Gov't Sent'g Mem. at 3; Def. Sent'g Mem. at 4; Plea ¶ 2.

Second, U.S.S.G. § 2B1.1(b)(2)(A)(i) adds 2 levels because the offense involved ten (10) or more victims.[3]  U.S.S.G. § 2B1.1(b)(2)(A)(i); PSR ¶ 25; Gov't Sent'g Mem. at 3; Def. Sent'g Mem. at 4; Plea ¶ 2.

---

[2] The parties initially calculated a Subtotal Adjusted Offense Level of 26. *See* Plea ¶ 2. The Total Adjusted Offense Level the parties stipulated to is 23 because the Adjusted Offense Level was subject to a two-level reduction if Defendant "clearly demonstrated acceptance of responsibility," and a one-level reduction should Defendant "plead[] guilty on or before July 18, 2025." *Id.*

[3] All parties agree ten or more victims were involved in this case, although neither Probation, the Government, or Defendant states the specific facts underlying that finding. *See* PSR ¶ 25; *see also* Gov't Sent'g Mem. at 3; *see also* Plea ¶ 2.

Third, U.S.S.G. § 2B1.1(b)(4) add 2 levels because the offense involved receiving stolen property, and Defendant was in the business of receiving and selling stolen property.[4] U.S.S.G. § 2B1.1(b)(4); PSR ¶ 26; Gov't Sent'g Mem. at 3; Plea ¶ 2.

Fourth, U.S.S.G. § 2B1.1(b)(10)(C) adds 2 levels because the offense involved sophisticated means, and Defendant intentionally engaged in or caused the conduct constituting sophisticated means. U.S.S.G. § 2B1.1(b)(10)(C); PSR ¶ 27; Gov't Sent'g Mem. at 3; Def. Sent'g Mem. at 4; Plea ¶ 2.

The parties further agree certain mitigation factors apply to Defendant. The parties agree a three-level reduction should apply for Defendant's timely acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b). U.S.S.G. §§ 3E1.1(a)–(b); PSR ¶¶ 32–33; Gov't Sent'g Mem. at 4; Def. Sent'g Mem. at 4; Plea ¶ 2.

Defendant's Criminal History Category is II due to his adult criminal convictions. U.S.S.G. § 4A1.1; PSR ¶¶ 36–44; Gov't Sent'g Mem. at 4; Def's Sent'g Mem. at 4. This is why the U.S. Probation Office ("Probation") and Defendant do not maintain the Plea stipulation to a two-level reduction if Defendant was a Zero-Point Offender.[5] Plea ¶ 2; PSR ¶¶ 22–44; Def. Sent'g Mem. at 4. Four of Defendant's convictions are not counted for purposes of computing criminal history because (1) one prior sentence for a violation was a term of probation not exceeding one year and one month, and (2) three prior sentences were not imposed within ten years of Defendant's commencement of the instant offense, or within fifteen years of the

---

[4] Defendant does not include this adjustment in its calculations but asserts a Total Adjusted Offense Level of 25 and Guidelines range of sixty-three (63) to seventy-eight (78) months' incarceration. *See* Def. Sent'g Mem. at 4. Thus, this seems to be a clerical oversight.

[5] In the Plea, the parties stipulated Defendant fell within a Criminal History Category of I. *See* Plea ¶ 2. However, the Government agrees with Probations' Guidelines calculation excluding the two-level reduction and assigning Defendant a Criminal History Category of II. *See* Gov't Sent'g Mem. at 4. Nevertheless, the Government recommended this Court acknowledge the two-level reduction when sentencing Defendant. *Id.*

commencement of the instant offense in the case of felonies. U.S.S.G. §§ 4A1.1(c)(1), (e)(3); *see* PSR ¶¶ 38–41.

The parties agree, pursuant to the Guidelines Sentencing Table, a Total Adjusted Offense Level of 25 and a Criminal History Category of II results in a Guidelines range of sixty-three (63) to seventy-eight (78) months' incarceration. U.S.S.G. § 5A; PSR ¶ 87; Gov't Sent'g Mem. at 4; Def. Sent'g Mem. at 4. As previously discussed, this Guidelines range is subject to a five-year statutory maximum under 18 U.S.C. § 371. *See supra* Part III(C).

This Court appreciates the sentencing arguments raised by all parties and has seriously considered each in turn.

### E.  Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5). The parties have not drawn the Court's attention to any applicable policy statements. Finding none on its own, the Court proceeds to the next § 3553(a) factor.

### F.  The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6).

The parties have not raised arguments regarding unwarranted sentencing disparities in this case. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

14

## G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Pursuant to the Plea, Defendant agreed to a Restitution Order "in the full amount of each victim's losses as determined by the Court" and consistent with 18 U.S.C. §§ 3663A and 3664. Plea ¶ 1. Probation's investigation only revealed a response from one victim thus far ("Victim-1") whom "SATG members committed a robbery of . . . on October 26, 2022." PSR ¶ 15. The jewelry stolen from Victim-1's store "was later sold to [Defendant]." *Id.* Victim-1's Affidavit of Loss to Probation "indicat[ed] a remaining total loss of $185,250 in lost property." *Id.*

As of the time of sentencing, no other responses have been received regarding victim losses. The Court reserves its right, pursuant to 18 U.S.C. § 3664(d)(5), to hold an evidentiary hearing within ninety (90) days after sentencing to determine the specific amounts owed to Defendant's victims. The Court will issue a Final Order of Restitution accordingly.

## IV. Conclusion

For the reasons set forth above, the Court sentences Defendant to forty-six (46) months' incarceration; one (1) year of supervised release with both the standard and special conditions of supervision; restitution as set forth in the forthcoming Order of Restitution; forfeiture of items identified in the Order of Forfeiture, issued on July 21, 2025; and a $100.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a)(2). The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the PSR, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises Defendant he has

15

fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

SO ORDERED.

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: April 24, 2026
       Brooklyn, New York

16